[Cite as *Ley v. Procter & Gamble Co.*, 2010-Ohio-834.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

ANNETTE S. LEY,

    PLAINTIFF-APPELLEE,

                               CASE NO. 1-09-41

    v.

THE PROCTER & GAMBLE CO.,

    DEFENDANT-APPELLANT,
    -and-

ADMINISTRATOR, BUREAU OF             O P I N I O N
WORKERS COMPENSATION,

    DEFENDANT-APPELLEE.

---

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV 2008 0759**

**Judgment Affirmed**

**Date of Decision:    March 8, 2010**

---

APPEARANCES:

    *Laura G. Harrelson* **f or Appellant**

    *Thomas L. Reitz* **for Appellee, Annette S. Ley**

Case No. 1-09-41

**PRESTON, J.**

{¶1} Defendant-appellant, Procter & Gamble Co. (hereinafter "P&G"), appeals the judgment of the Allen County Court of Common Pleas in favor of plaintiff-appellee, Annette S. Ley (hereinafter "Ley"), following a jury verdict entered in favor of plaintiff-appellee. For the reasons that follow, we affirm.

{¶2} This matter stems from the events that took place on November 13, 2006, when employee Ley was allegedly hurt during her employer P&G's annual physical while performing a pulmonary function test. While performing the pulmonary function test, Ley allegedly experienced back pain. As a result, Ley went to see a chiropractor, Dr. Carl Feltz, on November 20, 2006, and eventually, Ley went to see an orthopedic surgeon, Dr. Frank Fumich, on September 2, 2008. She was ultimately diagnosed with a lumbar sprain/strain and a lumbar disc protrusion.

{¶3} On February 11, 2008, Ley filed an appeal from the Industrial Commission's decision regarding her entitlement to participate in the Worker's Compensation system for the conditions of lumbar sprain/strain and lumbar disc protrusion. On March 12, 2008, P&G filed its answer, and on May 23, 2008, P&G also filed an appeal from the same decision of the Industrial Commission. The two cases were consolidated by the trial court under case number CV 2008 0759 on October 16, 2008.

Case No. 1-09-41

{¶4} A jury trial was held March 17-19, 2009. At the close of Ley's case, P&G moved for a directed verdict, arguing that there was insufficient evidence of causation, but the trial court overruled its motion. At the conclusion of the trial, the jury returned a verdict in favor of Ley, finding that she was entitled to participate in the Workers' Compensation system for both claimed conditions: lumbar sprain/strain and lumbar disc protrusion at L4-L5.

{¶5} On May 8, 2009, Ley filed a motion requesting attorney fees and deposition costs, which the trial court granted on May 21, 2009. However, soon after, P&G filed its answer brief to plaintiff's motion requesting attorney fees and deposition costs. Thereafter, on May 28, 2009, the trial court filed a second judgment entry awarding Ley attorney fees, costs, and expenses.

{¶6} P&G filed a motion for judgment notwithstanding the verdict or alternatively motion for a new trial on June 4, 2009, and Ley filed her motion in contra on June 16, 2009. The trial court overruled P&G's motions on July 1, 2009.

{¶7} P&G now appeals and raises four assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN FAILING TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT DR. FRANK FUMICH BECAUSE IT DID NOT SATISFY OHIO RULE OF EVIDENCE 703.**

-3-

{¶8} In its first assignment of error, P&G claims that the trial court erred in failing to exclude the testimony of Ley's expert, Dr. Frank Fumich (hereinafter "Dr. Fumich") when his testimony did not satisfy Evid.R. 703.

{¶9} "Trial courts have broad discretion in determining whether to admit or exclude evidence," and as such, their decisions will not be reversed absent an abuse of discretion. *Wasinski v. PECO II, Inc.*, 3d Dist. Nos. 3-08-14, 3-08-16, 2009-Ohio-2615, ¶48, citing *Deskins v. Cunningham*, 3d Dist. No. 14-05-29, 2006-Ohio-2003, citing *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 482 N.E.2d 1248; *State v. Osborn*, 3d Dist. No. 9-05-35, 2006-Ohio-1890, citing *State v. Bronlow*, 3d Dist. No. 1-02-95, 2003-Ohio-5757; *Wightman v. Consol. Rail. Corp.* (1999), 86 Ohio St.3d 431, 437, 735 N.E.2d 546. An "'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (internal citations omitted.)

{¶10} P&G claims that the trial court erred when it allowed Ley's expert, Dr. Fumich to testify because his testimony did not satisfy Evid.R. 703.

{¶11} Evid.R. 703 states that an expert's opinion must be based upon those facts or data "perceived by him or admitted in evidence at the hearing." *State v. Jones* (1984), 9 Ohio St.3d 123, 459 N.E.2d 526, syllabus, citing Evid.R. 703.

{¶12} Specifically, P&G claims that a significant part of Dr. Fumich's opinion – that the pulmonary function test caused Ley's injury – was based on the fact that Ley had felt a "pop" in her back during her pulmonary function test. Because this fact (that Ley had felt a "pop") was not admitted into evidence nor was it perceived by Dr. Fumich, P&G claims that his opinion was inadmissible. In support of its argument, P&G cites to the following testimony by Dr. Fumich:

> **Q. Okay. And based upon the history that she gave you, what is the basis for your opinion?**
> **A. The basis is that she was undergoing a functional capacity test with a forceful exhalation when she experienced this popping sensation in her back that has produced this problem.**

(Fumich Depo., Jan. 15, 2009). Dr. Fumich was questioned extensively regarding the importance of an accurate history in forming a medical opinion, and the significance of the descriptive word "pop" allegedly given to him by Ley at her appointment.

> **Q. You also indicated that she was performing the test, and she felt a pop in her back?**
> **A. Yes.**
> **Q. Are those her words? Was that her history given to you?**
> **A. Those – that is – those are her words given to him that I have repeated.**
> **Q. Okay. And so would it be a significant change in the history if that is the first time in any medical documentation of**

**any description of a history of this event that she ever used a description that there was a pop in her back?**

**A. What other terms have been used to describe it besides pop? Because pop may represent something similar to another sensation.**

**Q. No other symptom – no other description except experienced pain. It may be severe pain. May have been –**

**A. Pain.**

**Q. – a great deal of pain.**

**A. Uh-huh. But there was not any –**

**Q. But there's never been – there's nothing other than that. That's the first time that there was a description. And if that's the history given to you, and that is not an accurate description of the event, is that a flaw in the history?**

**A. If it is inconsistent with the previous chief complaint onset of pain, then that would be inconsistent, yes.**

**Q. And a pop is something that you would, as an orthopedic surgeon, find to be a significant description, or event, or symptom? I'm not sure what to call the pop.**

**A. I think it represents a significant event.**

**Q. In an injury to the back?**

**A. Yes.**

**Q. Okay. And those are terms, or words, or events that you look for when you're evaluating patients to diagnose correctly?**

**A. Correct.**

**Q. And to also connect causation – or a causation factor, an event that's described, and then what's the outcome in terms of a physical injury?**

**A. Correct. Yes.**

(Fumich Depo., Jan. 15, 2009). Later, Dr. Fumich admitted that "I only know what the patient tells me." (Id.).

{¶13} Moreover, during the trial, Ley testified that she had told Dr. Fumich that she had performed a pulmonary function test and had felt "pain at the onset and ever since that day." (March 17, 2009 Tr. at 137). When cross-examining

Ley during the trial regarding her description that she had given to Dr. Fumich, Ley testified as follows:

> **Q. So, you just described it as pain?**
> **A. I don't recall my exact words; but, I was in pain.**
> **Q. Have you ever identified your pain, or what you were feeling in any manner? I mean, did you classify it as anything other than pain?**
> **A. To Doctor Fumich?**
> **Q. Right.**
> **A. Not that I recall.**
> **Q. Okay. So, you never told him that you felt a pop in your back?**
> **A. I don't recall if I used the word 'pop' to Doctor Fumich, or not.**

(Id. at 137).

**{¶14}** P&G argues that Ley never testified that she had felt a "pop" or anything similar as a description of pain during trial. Therefore, it claims Dr. Fumich's opinion that P&G's pulmonary function test was the cause of Ley's back injury was inadmissible because it significantly relied on the fact that Ley had felt a "pop" while performing her test, which was a fact that was not in evidence.

**{¶15}** The weight of the opinion of an expert necessarily depends largely upon the facts on which it is based, thus the dependability of an expert's conclusions is a question of fact for the jury. *Davis v. Zucker* (1951), 106 N.E.2d 169. Therefore, we find that Dr. Fumich's testimony was not inadmissible merely for the fact that he based his diagnosis on the symptoms and history related to him by Ley who presented herself for treatment of an injury that had persisted for over

two years. *York v. Patterson Iron & Metal Co.* (Oct. 25, 1984), 2nd Dist. No. 8594, at \*3, citing *Cleveland Ry. Co. v. Merk* (1932), 124 Ohio St. 596, 180 N.E.2d 51. A treating physician is allowed to testify to symptoms and information presented to him by the patient, and to use this history in determining the cause of the patient's injury. The basis of an expert's testimony, flawed or perfect, goes to its weight, and not its admissibility. *Blakeman v. Condorodis* (1991), 75 Ohio App.3d 393, 599 N.E.2d 776. If the opinion is supported by the evidence, it will be entitled to greater weight, rather than if the opinion is not supported by the evidence or by reason.

{¶16} Here, the cross-examination of Dr. Fumich revealed that his opinion was largely based on Ley's history directly given to him by her during the first office visit, and that he had found her use of the word "pop" significant in his diagnosis and ultimate opinion about the underlying cause of her injury. Moreover, Dr. Fumich admitted that if the history given to him was incorrect, it could alter his diagnosis and opinion. In addition, when asked about the history she had given to Dr. Fumich, Ley could not recall whether she had used the word "pop" to describe her pain or not. Whether to believe Dr. Fumich's opinion about the causation of Ley's back injury, despite this questionable history given to him by Ley, was a question of fact and a matter of weight for the jury to decide.

{¶17} Therefore, we find that the trial court did not abuse its discretion when it found that Dr. Fumich's testimony was admissible.

{¶18} P&G's first assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED IN OVERRULING THE PROCTER AND GAMBLE CO.'S ("P&G") MOTIONS FOR A DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**

{¶19} In its second assignment of error, P&G claims that the trial court erred in failing to grant its motion for a directed verdict and its motion for judgment notwithstanding the verdict because there was insufficient evidence upon which reasonable minds could have reached different conclusions regarding whether P&G's pulmonary function test caused Ley's disc protrusion.

{¶20} Before addressing the merits of P&G's assignments of error, we note that the only issue in dispute on this appeal concerns Ley's disc protrusion and not the lumbar sprain/strain. Furthermore, after reviewing the record, we find that there was no evidence disputing the fact that Ley's lumbar sprain/strain was caused by performing the pulmonary function test. Not only did Ley's experts, Drs. Feltz and Fumich, opine that the pulmonary function test had caused Ley's lumbar sprain/strain, but P&G's expert, Dr. Shtull, also opined that the pulmonary function test had caused Ley's lumbar sprain/strain, although he believed that such injury had been resolved when he had met with Ley in February 2007. Therefore,

since both parties' experts agreed that Ley's lumbar sprain/strain was the result of performing the pulmonary function test, and there was no further evidence presented to the contrary, the jury had no other choice but to conclude that the lumbar sprain/strain was caused by P&G's pulmonary function test. Therefore, we decline to address this particular injury as it relates to P&G's second and third assignments of error.

{¶21} A motion for a directed verdict presents a question of law. *Good Year Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶4, citing *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 280 N.E.2d 896, paragraph three of the syllabus; *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. As such, we review the trial court's decision to grant or deny the motion de novo. Id. Civ.R. 50(A)(4) provides that a trial court shall grant a party's motion for directed verdict if, after construing the evidence most strongly in favor of the non-moving party, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [the non-moving party]." In making this determination, the trial court must decide whether the non-moving party presented evidence of substantial probative value in support of its claim. *Good Year Tire & Rubber Co.*, 2002-Ohio-2842, at ¶3, citing *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 69, 430 N.E.2d 935. It is clear that "'if there is substantial

competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Ramage v. Cent. Ohio Emergency Services, Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828, citing *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320, 199 N.E.2d 562. If the non-moving party cannot present "substantial competent evidence" from which reasonable minds could draw different conclusions, then the motion should be granted." *Shreve v. United Elec. & Constr. Co. Inc.* (2002), 4th Dist. No. 01CA2626, 2002-Ohio-3761, ¶26.

{¶22} An evaluation of a motion for judgment notwithstanding the verdict (JNOV) is governed by Civ.R. 50(B), and the standard applied is the same as when evaluating a directed verdict motion. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 477 N.E.2d 1145. As stated in *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 344 N.E.2d 334:

> **The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the [JNOV or directed verdict] motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must by denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination.**

{¶23} However, motions for a directed verdict and motions for JNOV are not evaluated identically. When a court rules on a motion for JNOV, all of the evidence introduced at trial is available for the trial court's consideration. *Osler v.*

*Lorain* (1986), 28 Ohio St.3d 345, 347, 504 N.E.2d 19. With a motion for a directed verdict, only the evidence presented during the plaintiff's case-in-chief is evaluated by the reviewing court. *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 206-07, 556 N.E.2d 490. The appellate court reviews the trial court's decision on both motions de novo. See *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399.

**{¶24}** Chapter 4123 of the Revised Code governs Ohio's workers' compensation program. In order for an injury to be compensable under workers' compensation law, the injury must have been in the course of the employment and arising out of the employment. R.C. 4123.01(C); *Gross v. Leroi Div. Dresser Industries* (Jan. 15, 1991) 3d Dist. No. 17-89-21, at *1. "The 'arising out of' element * * * contemplates a causal connection between the injury and the employment." *Fisher v. Mayfield* (1990), 49 Ohio St.3d 275, 277-78, 551 N.E.2d 1271. The causal connection between the injury and employment must be that of proximate cause such that a condition of employment produces "a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred." *Snyder v. Ford Motor Co.*, 3d Dist No. 1-05-41, 2005-Ohio-6415, ¶31, citing *Zavasnik v. Lyons Transp. Lines, Inc.* (1996), 115 Ohio App.3d 374, 377, 685 N.E.2d 567. See, also, *Aiken v. Indus. Comm.* (1944), 143 Ohio St. 113, 117, 53 N.E.2d 1018.

{¶25} Here, the only issue in dispute concerns whether Ley's disc protrusion at L4-L5 was proximately caused by performing P&G's pulmonary function test. P&G essentially argues that because Dr. Fumich's testimony was inadmissible under Evid.R. 703, there was insufficient evidence that Ley's disc protrusion was caused by the pulmonary function test conducted as part of Ley's employment with P&G. However, as we stated above, we find that Dr. Fumich's testimony was admissible and that any issues regarding the description given to him by Ley went to the weight and not the admissibility of Dr. Fumich's opinion. Overall, after a review of the evidence, we find that the trial court did not err in denying P&G's motion for directed verdict.

{¶26} At trial, Ley testified that she has been a floor technician at P&G since August 23, 2004. (Mar. 17, 2009, Tr. at 103). As part of her job, she worked a rotating shift and performed a variety of duties relating to the packing of products for transport. (Id. at 103-04). On November 13, 2006, Ley said that she reported for a company physical with a P&G nurse, KaLena Downtown. (Id. at 105-06). One of the portions of the physical was the performance of a pulmonary function test, and Ley stated as follows:

> **They have you sit in a chair. The machine is in front of you, with the tube sticking out and directed towards you. You have to lean over and bend over to get close to it and to, you know get that breath. They ask you to inhale. Immediately upon inhaling then you give a forceful exhale. It's just not a quick exhale. It's**

**a prolonged exhale. It's not something that is easy to do – to hold an exhale for any length of time.**

(Id. at 106). When performing the initial forceful exhale of the test, Ley testified that "upon that forced breath I felt pain in my lower back." (Id. at 106). Ley said that the nurse asked her whether she was okay, to which she told the nurse, "no, my chest doesn't hurt; but, my back does." (Id.). Ley stated that she went back to work that day, but continued to feel pain over the next several days, and stated, "I was in excruciating pain. I was unable to stand upright. It was very difficult to breathe. I couldn't stand up. I wasn't able to do anything. So, I just went to bed and tried to get comfortable." (Id. at 108). In addition, Ley mentioned her back pain to two co-workers – Max McCafferty and Cheryl Kirkendall – both of whom testified that they had had conversations with Ley regarding her back pain following the pulmonary function test. (Id. at 64-71, 72-76, 107).

{¶27} On November 16, 2006, Ley sent an email to Nurse Downtown and Nurse Beverly Schweller (another P&G nurse), informing them that she believed she had hurt her back during the pulmonary function test. (Id. at 109); (Plaintiff's Ex. 1). Additionally, on November 20, 2006, Ley testified that she went to see a chiropractor, Dr. Carl Feltz, and told him that she was experiencing severe low back pain. (Id. at 112). Furthermore, Ley stated that Dr. Feltz referred her to an orthopedic surgeon, Dr. Frank Fumich, and she said that she went to see Dr. Fumich twice in November 2008.

{¶28} Dr. Feltz testified at trial via video deposition on behalf of Ley. (Feltz Depo., Jan. 23, 2009). Dr. Feltz stated that he first saw Ley on November 20, 2006, and has continued to treat Ley since that time for her lumbar sprain. (Id.). He stated that on the initial questionnaire that Ley filled out, she indicated that she had exhibited pain all across her back while performing her employer's pulmonary function test. (Id.). Dr. Feltz conducted his initial examination of Ley, and noted that she had problems lifting her legs while lying on her back, which indicated a problem with the lumbar part of her spine. (Id.). He ultimately diagnosed her as having a lumbar sprain/strain, referred her out to have an MRI performed in November 2006, and had her come in for a series of chiropractic treatments, which she still was currently completing with his office. (Id.). Overall, Dr. Feltz stated that within a reasonable degree of chiropractic probability, based on his care, treatment, and Ley's complaints, he believed that Ley's sprain/strain had been caused by the performance of the pulmonary function test on November 13, 2006. (Id).

{¶29} On cross-examination, Dr. Feltz admitted to initially including both the lumbar sprain/strain and the lumbar disc protrusion on Ley's insurance documents, but later deleting the lumbar disc protrusion from the documents because only the lumbar sprain/strain was being covered. (Id.). He also testified that he was only treating Ley for a lumbar sprain/strain and not a lumbar disc

protrusion. (Id.). Furthermore, he admitted to waiting almost two years before referring Ley out to an orthopedic surgeon. (Id.). However, Dr. Feltz later clarified that he believed that there had not been any reason for Ley to have met with an orthopedic surgeon any earlier since her pain had been decreasing with just the chiropractic treatments; it was only after two years when Dr. Feltz determined that he had done all he could for Ley, but that Ley needed to see a specialist in order to be completely relieved of her back pain. (Id.).

{¶30} Dr. Fumich was the orthopedic surgeon who saw Ley about her back pain, and he also testified via video deposition at the trial. (Fumich Depo., Jan. 15, 2009). He said that he first saw Ley on September 2, 2008, and that Ley was complaining of back and leg pain. (Id.). When taking Ley's history, Dr. Fumich stated that Ley informed him that she had been performing a pulmonary function test when she had experienced a "pop" and then back pain, which about two to four weeks later had spread from her back down to her legs. (Id.). Dr. Fumich performed an examination and looked at an MRI that Ley had brought in with her, which showed a disc protrusion at her L4-L5 disc space. (Id.). Dr. Fumich stated that this finding was consistent with the symptoms of pain Ley had described to him. (Id.).

{¶31} Ley saw Dr. Fumich again on November 23, 2008, because her back pain was still present. (Id.). Dr. Fumich ordered another MRI, which, like the

previous MRI brought in by Ley (the one conducted on November 26, 2006), also revealed a right sided L4-L5 lumbar disc protrusion. (Id.). At this time, Dr. Fumich recommended physical therapy so that Ley could strengthen her core muscles. (Id.). Dr. Fumich explained that a variety of things can cause damage to one's disc, especially any type of forceful movement across one's back. (Id.). As it related to Ley's injury, Dr. Fumich opined that based on his initial evaluation of Ley's history, and the fact that she had not had prior back problems before November 16, 2006, he believed that Ley's forceful exhalation during the pulmonary function test had caused her sprain/strain and disc protrusion. (Id.). He explained further that it does not take a lot of force to cause damage to one's disc, thus it was not unlikely that performing this pulmonary function test could cause damage to someone's disc. (Id.).

{¶32} On cross-examination, Dr. Fumich stated that the basis for his opinion was that "she was undergoing a functional capacity test with a forceful exhalation when she experienced this popping sensation in her back that has produced this problem," which was significantly based on the history given to him by Ley. (Id.). Dr. Fumich admitted that if the description given to him regarding the chief complaint of pain is not an accurate description of the event as it happened then the patient's history that he relies on would be inconsistent. (Id.). While Dr. Fumich said that Ley had used the word "pop" to describe the onset of

her pain while performing the pulmonary function test, and while a "pop" represents a significant event to him as an orthopedic surgeon, he said that he can only rely on what the patient tells him when making his diagnosis and ordering corresponding treatment. (Id.).

{¶33} After reviewing the above evidence in a light most favorable to Ley as the non-moving party, we believe that there is substantial evidence upon which reasonable minds could have come to different conclusions as to whether Ley's disc protrusion was caused by performing P&G's pulmonary function test as part of her company physical. Ley testified that while performing the pulmonary function test she made a forceful exhalation and immediately felt pain in her lower back. She subsequently told two co-workers, who corroborated her testimony, and a few days after the incident told two P&G nurses. As a result of her pain, she went to see a chiropractor and eventually an orthopedic surgeon, and as a result, she was diagnosed as having a lumbar sprain/strain and a disc protrusion at her L4-L5 lumbar disc. Dr. Fumich opined that Ley's lumbar disc protrusion had been caused by performing P&G pulmonary function test. While this opinion was based on the history and descriptions given by Ley, the opinion was also based on MRIs and a physical examination. "[A] court considering a directed verdict motion must determine not whether one version of the facts is more persuasive than the other, but instead, must determine whether the trier of fact could reach

only one conclusion under the theory of law presented in the complaint." *Pollock v. Assoc. Public Adjusters, Inc.*, 4th Dist. No. 06CA8, 2007-Ohio-1726, ¶13, citing *Evans v. Dayton Power and Light Co.*, 4th Dist. No. 03CA763, 2004-Ohio-2183, citing *Ramage*, 64 Ohio St.3d at 109. Thus, despite the questionable credibility of Ley's descriptions to the orthopedic surgeon, the fact remains that there was some admissible evidence linking Ley's disc protrusion with P&G's pulmonary function test which was conducted while Ley was at work. Thus, the trial did not err in denying P&G's motion for a directed verdict.

{¶34} With respect to the motion for JNOV, P&G presented two witnesses in its case-in-chief: Dr. Kiva Shtull and Nurse Downtown. Dr. Shtull testified via video deposition and stated that he had been asked to conduct an independent medical evaluation on Ley in February 2007. (Shtull Depo., Jan. 19, 2009). In prefacing his opinion, Dr. Shtull stated that there were many common and routine causes of a disc sprain/strain; however, in his opinion a single trauma event was unlikely to be severe enough to cause a disc protrusion. (Id.). Rather, Dr. Shtull said that generally a disc protrusion is caused by the natural aging and dehydration of the disc. (Id.). With respect to Ley, Dr. Shtull testified that he had examined her in February 2007, and prior to conducting his own examination, he had reviewed the November 30, 2006 MRI report, which indicated that Ley had a shallow disc protrusion centrally located to the right at the L4-L5 lumbar disc, and

degenerative changes to the joints at the L4-L5 lumbar disc level. (Id.). Then Dr. Shtull examined Ley and found her to be "completely normal." (Id.). Moreover, he stated that Ley never indicated to him that she was having any pain, and in fact had told him that she was "good." (Id.). Based on the MRI report, Ley's medical records, and his examination, Dr. Shtull stated that in his opinion he believed the lumbar sprain/strain had been related to Ley's performance of the pulmonary function test, though later he stated that he believed that opinion he had given was rather generous considering he believed her injury had been minor. (Id.). However, Dr. Shtull did not believe that the lumbar disc protrusion had been caused by performing P&G's pulmonary function test for two reasons: (1) Ley was 36 years old at the time of the test and the MRI was taken 2 weeks later, which showed degeneration of her spinal joints that in his opinion had been present years before she performed the test; (2) although performing the pulmonary function test could be considered strenuous, it was not that severe of an activity such that one would expect it to cause any injury to a disc in someone's back. (Id.). For those reasons, Dr. Shtull opined that he did not believe Ley's disc protrusion had been caused by performing P&G's pulmonary function test. (Id.).

{¶35} On cross-examination, Dr. Shtull admitted that he had only examined Ley once on November 1, 2007, and although she indicated to him that she was feeling fine at the examination, Dr. Shtull acknowledged that she was

working "light duty" at P&G, and that P&G had modified her working duties to accommodate her back injuries. (Id.). Moreover, Dr. Shtull stated that Ley had told him that she did not have any back problems prior to performing the pulmonary function test. (Id.). Finally, Dr. Shtull admitted that, while he had looked at the November 30, 2006 MRI report, he did not look at the film, although he had subsequently reviewed the September 23, 2008 MRI report and nothing in it made him want to change his current opinion about the causation of Ley's disc protrusion. (Id.).

{¶36} Finally, Nurse Downtown testified again, this time for P&G, and stated that her job at P&G is to conduct P&G's annual physicals, and that she also manages the cases that are involved with the workers' compensation program. (Mar. 18, 2009 Tr. at 180-81) She went on to explain the process involved with P&G's physicals, which includes the employees filling out questionnaires, measuring the employee's weight, height, and vitals, checking the employee's hearing, and completion of the pulmonary function test. (Id. at 182-83). Nurse Downtown explained that the purpose of the pulmonary function test is to determine the employee's lung capacity and to identify any restrictive and obstructive patterns. (Id. at 183). Nurse Downtown said that she closely watches the employees while they are conducting the pulmonary function test, and that the

most common problem she observes is the employee feeling light-headed and dizzy. (Id. at 184).

**{¶37}** With respect to Ley, Nurse Downtown testified that she was the nurse that conducted Ley's physical on November 13, 2006; however, Nurse Downtown could not remember anything unusual about her physical. (Id. at 184-85). She stated that Ley never voiced any complaints to her nor did Nurse Downtown notice any physical manifestations that would have indicated to her that Ley was experiencing any pain. (Id. at 185-91). Nurse Downtown further testified that if Ley had voiced any complaints or showed any signs of pain, she would have noted the complaints/signs in the employee's documentation, but there were no written notations indicating that Ley had made any complaints, or that Ley had exhibited any physical manifestations that she had been experiencing pain in the documentation. (Id. at 185-91); (Defense Exs. B & C). Despite her testimony for P&G, during cross-examination, Nurse Downtown admitted that she had previously testified that she could not recall whether Ley had voiced any complaints, and that she was currently testifying that Ley had now not made any complaints to her. (Id. at 192-93).

**{¶38}** P&G again claims that because Dr. Fumich's testimony was inadmissible, there was no other evidence that Ley's disc protrusion was caused by P&G's pulmonary function test; and thus, P&G's motion for JNOV should

have been granted. However, as we stated above, Dr. Fumich's testimony was admissible and any issues regarding the basis of his opinion on causation went to its weight. Thus, because there was some evidence linking Ley's disc protrusion to P&G's pulmonary function test, even when considering P&G's evidence, we find that there was substantial evidence to support the position that reasonable minds could reach differing conclusions regarding the circumstances of Ley's disc protrusion. Accordingly, we find that the trial court did not err in denying P&G's motion for JNOV.

{¶39} P&G's second assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN OVERRULING P&G'S MOTION FOR A NEW TRIAL.**

{¶40} In its third assignment of error, P&G claims that the trial court erred in overruling its motion for a new trial. P&G argues that its motion was based on both the sufficiency of the evidence and the trial court's error in allowing Dr. Fumich to testify when his testimony was in violation of Evid.R. 703.

{¶41} A trial court may grant a new trial if the judgment of the jury is not sustained by the weight of the evidence. Civ.R. 59(A)(6). When reviewing the jury's verdict, the trial court independently weighs the evidence and examines the credibility of the witnesses. See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 351, 504 N.E.2d 19, citing *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 83, 202 N.E.2d

685, paragraph three of the syllabus. In its review, however, the trial court is only to determine whether the jury's verdict has shaped a manifest injustice and whether the verdict is against the manifest weight of the evidence. Id. If no such injustice is found, the trial court must deny the request for a new trial. Id. An appellate court reviews a trial court's decision regarding a motion for a new trial under an abuse of discretion standard of review with respect to arguments relating to the sufficiency of the evidence. *Rohde*, 23 Ohio St.2d at 83, paragraph one of the syllabus. An "abuse of discretion" connotes more than an error in law or judgment; it implies that the attitude of the court is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. However, were a new trial motion turns on a question of law, the trial court may be reversed upon a showing that the decision was erroneous as a matter of law. *Rohde*, 23 Ohio St.2d at 83, paragraph two of the syllabus.

{¶42} With respect to P&G's argument that the trial court erred in allowing Dr. Fumich to testify, thus the trial court erred as a matter of law in denying its motion for a new trial, again, as stated above, we find that the trial court did not err in allowing Dr. Fumich's testimony; therefore, we find that it did not err as a matter of law in denying P&G's motion for a new trial on this basis.

{¶43} With respect to P&G's argument that there was insufficient evidence to have supported the jury's verdict that Ley's disc protrusion was caused by

performing P&G's pulmonary function test, based on the evidence presented above, we conclude that the trial court did not abuse its discretion when it denied the motion for a new trial. There is substantial credible evidence in this case to support the conclusion that Ley's disc protrusion was caused by performing P&G's pulmonary function test. Ley testified that when she made a forceful exhalation during P&G's pulmonary function test for her annual physical she experienced pain in her back. She told this description of the event to two co-workers, who corroborated her statements. Moreover, one of Ley's expert witnesses opined that her lumbar disc protrusion had been caused by performing the pulmonary function test. This evidence was adequately countered by P&G's witnesses. Nurse Downtown could not recall whether Ley had made any complaints during the physical, but she would have documented anything abnormal, which she did not in Ley's case. Moreover, while Dr. Shtull did not believe that performing the test had caused her lumbar disc protrusion because he believed the lumbar disc protrusion had been caused by degenerative disc disease, the basis for his findings came from reading the reports and not individually assessing Ley's MRI films.

{¶44} Therefore, because the record contains evidence to support the jury's determination that P&G's pulmonary function test caused Ley's disc protrusion,

we find that the trial court did not abuse its discretion when it overruled P&G's motion for new trial.

**{¶45}** P&G's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED IN ITS AWARD AND COSTS TO PLAINTIFF IN BOTH ITS MAY 28, 2009 ENTRY AWARDING ATTORNEY FEES, COSTS AND EXPENSES AND ITS MAY 21, 2009 JUDGMENT ENTRY.**

**{¶46}** In its last assignment of error, P&G argues that the trial court erred in awarding certain submitted costs and expenses to Ley because Ley failed to submit evidentiary support for such costs, and such costs and expenses were unreasonable under the circumstances. In particular, P&G claims that the following fees and costs awarded by the trial court were erroneous:

1. Fees for deposition times of Dr. Fumich ($1,750.00) and Dr. Feltz ($900.00)
2. Cost of the Stenographic Transcript of Plaintiff's Deposition ($422.80)
3. Costs for Service of Subpoenas ($190.00)
4. Exhibits and Enlargements ($13.70)
5. Reimbursement of Mileage for Plaintiff's Attorney to Attend Depositions ($316.26)

**{¶47}** We review the trial court's decision on an award of fees and costs under R.C. 4123.512(D) & (F) using an abuse of discretion standard. *Dixon v. Ford Motor Co.*, 8th Dist. No. 82148, 2003-Ohio-3959, ¶5. An abuse of discretion

is more than an error of law; rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶48} Under R.C. 4123.512, a claimant who successfully appeals from a denial of benefits is entitled to recovery of certain costs of litigation. Specifically, R.C. 4123.512(D) and (F) govern a claimant's recovery of costs of an appeal to the trial court. R.C. 4123.512(D) provides, in pertinent part:

> **The bureau of workers' compensation shall pay the cost of the stenographic deposition filed in court and of copies of the stenographic deposition for each party from the surplus fund and charge the costs thereof against the unsuccessful party if the claimant's right to participate or continue to participate is finally sustained or established in the appeal.**

Taxing of costs incurred by a successful claimant are also permitted by R.C. 4123.512(F), which provides:

> **The cost of any legal proceedings authorized by this section, including an attorney's fee to the claimant's attorney to be fixed by the trial judge, based upon the effort expended, in the event the claimant's right to participate or to continue to participate in the fund is established upon the final determination of an appeal, shall be taxed against the employer or the commission if the commission or the administrator rather than the employer contested the right of the claimant to participate in the fund. The attorney's fee shall not exceed forty-two hundred dollars.**

{¶49} The Ohio Supreme Court has construed this provision liberally in favor of employees. See *Cave v. Conrad* (2002), 94 Ohio St.3d 299, 301, 762 N.E.2d 991. In *Moore v. General Motors Corp.* (1985), 18 Ohio St.3d 259, 480 N.E.2d 1101, the Court held that "the cost of any legal proceedings authorized by

this section," included fees charged by an expert witness whose deposition was used in a workers' compensation hearing. Moreover, in *Kilgore v. Chrysler Corp.* (2001), 92 Ohio St.3d 184, 749 N.E.2d 267, at syllabus, the Court held that "an attorney's travel expenses incurred in taking a deposition of an expert are reimbursable 'cost of any legal proceedings' under R.C. 4123.512(F)." The Court has also extended the recoverable costs and has found that reasonable videotaped deposition expenses were reimbursable under R.C. 4123.512(F). *Cave*, 94 Ohio St.3d 299, 762 N.E.2d 991, at syllabus.

{¶50} Furthermore, the Ohio Supreme Court has made it very clear in its recent cases that the purpose of R.C. 4123.512(D) and (F) is "'designed to minimize the actual expense incurred by an injured employee who establishes his or her right to participate in the fund.'" *Cave,* 94 Ohio St.3d at 301, quoting *Moore,* 18 Ohio St.3d 261-62. Thus, a claimant's recovery must not be dissipated by reasonable litigation expenses with the preparation and presentation of an appeal pursuant to R.C. 4123.512. Id. at 301. Overall, because the Ohio Supreme Court has repeatedly stated that the traditional dichotomy between "costs" and "expenses" in civil cases does not directly apply to workers' compensation cases, R.C. 4123.512(F) allows reimbursement for reasonable litigation expenses which "bear[] a direct relation to a claimant's appeal that lawyers traditionally charge to

clients and that also have a proportionally serious impact on a claimant's award."

*Kilgore*, 92 Ohio St.3d at 188.

{¶51} P&G essentially claims that Ley failed to provide evidentiary support for the fees for the depositions of Ley's experts, the cost of the stenographic transcript of Ley's deposition, the costs for the service of the subpoenas, and the costs for copies of exhibits and enlargements. We disagree. After reviewing the record, we find that there was evidence upon which the trial court could have relied on in granting or denying Ley's award of costs and expenses. Moreover, given the trial court's discretion in awarding costs and expenses pursuant to R.C. 4123.512(D) and (F), and given the overall purpose of R.C. 4123.512(D) and (F) (to minimize the actual expenses incurred by an injured employee who establishes their right to participate in the workers' compensation fund), we do not believe that the trial court abused its discretion in awarding the above costs and expenses. See *Paris v. Dairy Mart-Lawson*, 2nd Dist. No. 19871, 2003-Ohio-6673, ¶¶34-35 (finding that a workers' compensation claimant, who prevailed on claim to participate in workers' compensation fund, was entitled to be reimbursed for litigation costs for court filings, investigative services, reporting services, travel expenses, photocopies, trial exhibits, witness fees, facsimiles, and messenger service, where such costs were of type that would traditionally be charged to clients and that had a direct relation to claimant's appeal.).

{¶52} In addition, with respect to Ley's attorney's travel expenses, P&G claims that the Court in *Kilgore* only allowed "travel expenses incurred in taking the deposition of an *out-of-town* expert witness." 92 Ohio St.3d at 188 (emphasis added). Here, P&G alleges that the expert witnesses were not "out of town," plus neither was Ley's attorney, thus, *Kilgore*'s reasoning is inapplicable and the trial court erred when it awarded Ley's attorney mileage expenses. While there was some discussion about the location of Ley's attorney's office (either in Lima or Columbus), we note that throughout the record, including the affidavit submitted to the trial court in regards to Ley's potential award of costs, Ley's attorney listed a Columbus address, not a local Lima address. (See, e.g., Doc. Nos. 3, 15, 16, 18) Moreover, we do not believe that the Court's holding in *Kilgore* is as narrow as P&G suggests. We believe that the Court's rationale in *Kilgore*, just like its rationale in all of its recent cases dealing with R.C. 4123.512(D) and (F), was to allow those expenses that are directly related to a claimant's appeal that an attorney would traditionally charge to clients and that would also have a proportionally serious impact on the claimant's award. *Kilgore*, 92 Ohio St.3d at 187. We believe that it was reasonable for the trial court to have believed that Ley's out-of-town attorney's mileage expenses to attend the depositions of Ley's witnesses did bear a direct relationship to Ley's appeal and would have a serious impact on her award if not granted.

**{¶53}** Finally, P&G claims that there are problems with the trial court's May 21, 2009 judgment entry which finalized the jury's verdicts entered in favor of Ley, and which stated at the end "All attorney fees, costs and expenses charged to Defendants." (May 21, 2009 JE). P&G claim that R.C. 4123.512 caps the recoverable attorney's fees at $4,200.00, and does not allow for the recovery of all costs and expenses to Ley, thus the trial court's judgment entry is erroneous. While the trial court did state all attorney's fees, costs, and expenses shall be charged to P&G in its May 21, 2009 judgment entry that finalized the jury verdicts, P&G has neglected the trial court's additional May 21, 2009 judgment entry captioned "Entry Awarding Attorney Fees, Costs And Expenses Pursuant to R.C. 4123.512(D) and (F)." (Doc. No. 63). In this judgment entry, the trial court specifically awarded only $4,200.00 in attorney's fees to Ley, and declared that Ley was entitled to reimbursement for "expert fees, videographer, Court filing fee, mileage, subpoenas, trial exhibits, transcript of Plaintiff's deposition," which totaled in the amount of $9,192.96. (Id.). Thus, the trial court did not grant a general award of *all* attorney fees, costs and expenses, but rather, followed the statutorily prescribed requirements and caps listed in R.C. 4123.512(D) and (F).

**{¶54}** Accordingly, for all the above reasons, we do not believe that the trial court abused its discretion in its award of attorney fees, costs, and expenses pursuant to R.C. 4123.512(D) & (F).

**{¶55}** P&G's fourth assignment of error is, therefore, overruled.

**{¶56}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**